**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

| | |
|---|---|
| **KOSTAS S. GIANNOULIAS,**<br>Petitioner,<br>v.<br>**FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION,**<br>Respondent. | **No. ____________________**<br><br>Agency Docket No.<br>FMCSA-2026-0958 |

## PETITION FOR REVIEW

Petitioner Kostas S. Giannoulias petitions this Court, under Federal Rule of Appellate Procedure 15 and 28 U.S.C. §§ 2342(3)(A), 2343, and 2344, for review of the Federal Motor Carrier Safety Administration's final order granting a five-year exemption, which FMCSA made effective October 7, 2026, titled *Parts and Accessories Necessary for Safe Operation; Application for Exemption From Aurora Operations, Inc (USDOT #341156)*, Docket No. FMCSA-2026-0958, FR Doc. 2026-20734. FMCSA published the order on October 9, 2026, at 91 Fed. Reg. 64,736–64,741. A copy of the official Federal Register publication is attached as Attachment A.

## JURISDICTION, VENUE, AND TIMELINESS

1. This Court has exclusive jurisdiction under 28 U.S.C. § 2342(3)(A). FMCSA issued the challenged order under 49 U.S.C. §§ 31136(e) and 31315(b). The order is final agency action reviewable under the Hobbs Act and 5 U.S.C. §§ 702, 704, and 706. The United States is a respondent by operation of 28 U.S.C. § 2344 and Federal Rule of Appellate Procedure 15(a)(2)(B).

2. Venue is proper under 28 U.S.C. § 2343 because Petitioner is based in Northbrook, Illinois, and maintains his principal office there, within this Circuit.

3. This petition is timely under 28 U.S.C. § 2344. It is filed fourteen days after the order's stated October 7, 2026 effective date and twelve days after its October 9, 2026 publication.

## ORDER UNDER REVIEW

4. The order exempts Aurora Operations, Inc. and any other motor carrier that gives prior notice to FMCSA and operates covered Level 4-capable commercial motor vehicles from portions of 49 C.F.R. §§ 392.22(b), 393.25(e), and 393.95(f). It authorizes cab-mounted warning beacons in place of the warning devices and placement otherwise required by those regulations. The order purports to have become effective on October 7, 2026—two days before Federal Register publication—and to remain effective through October 7, 2031.

## PETITIONER AND STANDING

5. Petitioner is a 'party aggrieved' within the meaning of 28 U.S.C. § 2344. He is directly affected by the order and made timely attempts to submit a written comment during the noticed comment period, but repeated failures of the Government's designated Regulations.gov portal prevented submission of his prepared comment. Petitioner is an interstate owner-operator and expediter whose vehicle is both his workplace and his home while he remains on the road for two to three months at a time. In approximately 1.2 years, he drove

approximately 199,000 miles over a nationwide freight network, including Texas and other corridors in which covered vehicles operate. His work involves time-sensitive, high-value emergency freight, and dispatch demands often prevent him from predicting his routes in advance. The order subjects him to continuing roadway exposure to disabled covered trucks using the substituted warning system and has caused him to decline otherwise available freight, including Texas work, to avoid that safety risk. Those present safety and economic injuries are concrete, particularized, traceable to the order, and redressable by the relief requested.

## GROUNDS FOR REVIEW

6. The order is contrary to 49 U.S.C. §§ 31136(e) and 31315(b), arbitrary and capricious, unsupported by substantial evidence in the record considered as a whole, and otherwise not in accordance with law. Among other errors, FMCSA reversed its December 2024 denial without a reasoned explanation grounded in materially different safety evidence; extrapolated from limited company, waiver, and study information to a nationwide, classwide exemption; failed to make relevant, nonprotected waiver-operation information known to the agency available for public inspection as required by 49 U.S.C. § 31315(b)(6)(A); failed to address later waiver-operation data and relevant federal crash records; failed to address material contrary evidence, comments, and record gaps concerning beacon visibility, occlusion, road geometry, adverse conditions, and warning

effectiveness; and adopted a notice, self-certification, and reporting structure that does not support the required finding of an equivalent or greater level of safety.

7. FMCSA also failed to provide a lawful and meaningful procedure. Repeated failures of the Regulations.gov comment portal prevented Petitioner from submitting his prepared comment during the comment period. The portal also displayed “Closed For Comments” before the stated May 15, 2026 deadline. The order additionally purported to take effect before the Federal Register publication through which FMCSA announced the decision, the covered class, and the exemption’s operative terms and conditions.

8. Petitioner preserves all additional statutory, procedural, constitutional, evidentiary, and Administrative Procedure Act grounds supported by the administrative record and any properly completed or supplemented record.

## RELATED PROCEEDING

9. Giannoulias v. Federal Motor Carrier Safety Administration, No. 26-2838 (7th Cir.), is a related proceeding challenging separate three-month waivers issued under 49 U.S.C. § 31315(a). Petitioner identifies that proceeding as related but does not seek consolidation through this petition.

## RELIEF REQUESTED

Petitioner respectfully requests that this Court: (1) stay the October 7, 2026 exemption order pending review; (2) hold the order unlawful and set it aside; (3) vacate the order and remand the matter to FMCSA; and (4) grant any other relief the Court deems just and proper.

Dated: October 21, 2026

Respectfully submitted,

Kostas Giannoulias, pro se
3851 Mission Hills Road, Unit 210
Northbrook, Illinois 60062
Telephone: 708-772-6738
Email: kostas@haasefreightsystems.com

**FEDERAL RULE OF APPELLATE PROCEDURE 15(c)**
**LIST AND CERTIFICATE OF SERVICE**

Aurora Operations, Inc. was the applicant in the agency proceeding. Pursuant to Federal Rule of Appellate Procedure 15(c), its service information is:

Aurora Operations, Inc.
Attn: Shelley Webb, Chief Legal Officer
280 N. Bernardo Avenue
Mountain View, California 94043

I certify that on October 21, 2026, I served Aurora Operations, Inc. with a copy of this Petition for Review and Attachment A by USPS Certified Mail, postage prepaid, at the address above.

Under 28 U.S.C. § 2344 and Federal Rule of Appellate Procedure 15(c), the circuit clerk serves Respondent FMCSA and the Attorney General of the United States with the Petition for Review.

Kostas Giannoulias

# ATTACHMENT A

## ORDER UNDER REVIEW

FMCSA Docket No. FMCSA-2026-0958

FR Doc. 2026-20734

91 Fed. Reg. 64,736–64,741 (Oct. 9, 2026)

Stated effective date: October 7, 2026

Issued on: October 6, 2026.

**Jazmyne Lewis,**

*Information Collection Officer.*

[FR Doc. 2026–20718 Filed 10–8–26; 8:45 am]

**BILLING CODE 4910–22–P**

---

## DEPARTMENT OF TRANSPORTATION

### Federal Motor Carrier Safety Administration

**[Docket No. FMCSA–2026–0958]**

### Parts and Accessories Necessary for Safe Operation; Application for Exemption From Aurora Operations, Inc (USDOT #341156)

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), U.S. Department of Transportation (DOT).

**ACTION:** Notice of final disposition; grant of application for exemption.

**SUMMARY:** FMCSA announces its decision to grant a limited five-year exemption to Aurora Operations, Inc. (Aurora) and other motor carriers operating Level 4 automated driving system (ADS)-equipped commercial motor vehicles (CMVs), with prior notice to FMCSA, from compliance with the warning device placement requirements, the steady-burning lamp requirements, and the requirements for the types and number of warning devices. This exemption permits motor carriers to use cab-mounted warning beacons in lieu of traditional warning devices on Level 4 ADS-equipped CMVs. The Agency has determined that granting the exemption would likely achieve a level of safety equivalent to or greater than the level of safety provided by the regulation.

**DATES:** The exemption is effective October 7, 2026 and expires October 7, 2031.

**FOR FURTHER INFORMATION CONTACT:** Mr. Vinay Nagabhushana, Vehicle and Roadside Operations Division, Office of Carrier, Driver and Vehicle Safety Standards; *MCPSV@dot.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation

### *Viewing Comments and Documents*

To view any documents mentioned as being available in the docket, go to *https://www.regulations.gov/docket/FMCSA-2026-0958/document* and choose the document to review. To view comments, click this notice, then click "Document Comments." If you do not have access to the internet, you may view the docket online by visiting Dockets Operations in the DOT West Building, 1200 New Jersey Avenue SE, W58–213, Washington, DC 20590–0001, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

## II. Legal Basis

FMCSA has authority under 49 U.S.C. 31136(e) and 31315(b) to grant exemptions from the Federal Motor Carrier Safety Regulations (FMCSR). FMCSA must publish a notice of each exemption request in the **Federal Register** (49 CFR 381.315(a)). The Agency must provide the public an opportunity to inspect the information relevant to the application, including the applicant's safety analysis. The Agency must provide an opportunity for public comment on the request.

The Agency reviews the application, safety analyses, and public comments submitted and determines whether granting the exemption would likely achieve a level of safety equivalent to, or greater than, the level that would be achieved absent such exemption, pursuant to the standard set forth in 49 U.S.C. 31315(b)(1). The Agency must publish its decision in the **Federal Register** (49 CFR 381.315(b)). If granted, the notice will identify the regulatory provision(s) from which the exempted party will be exempt, the effective period, and all terms and conditions of the exemption (49 CFR 381.315(c)(1)). If the exemption is denied, the notice will explain the reason for the denial (49 CFR 381.315(c)(2)). The exemption may be renewed (49 CFR 381.300(b)).

## III. Background

### *Current Regulatory Requirements*

Aurora requests an exemption from certain FMCSR related to requirements for placing warning devices around a stopped CMV, requirements that exterior lamps be steady burning, and requirements that specific types of warning devices be used. Section 392.22(b) of the FMCSR requires the driver of a CMV stopped on the traveled portion or shoulder of a road for any cause other than a necessary traffic stop to activate hazard warning signal flashers and place required warning devices as soon as possible, but within ten minutes, at specified locations behind and in front of the stopped CMV. Section 392.22(b) also specifies placement of warning devices in certain circumstances, such as during daylight hours, or where devices may be obstructed from view (*e.g.,*when stopped within 500 feet of a curve or the crest of a hill).

Section 393.25(e) of the FMCSR requires that all exterior lamps be steady burning, with exceptions not relevant here.

Section 393.95(f) of the FMCSR specifies the types and number of warning devices to be used for stopped vehicles, namely three bidirectional emergency reflective triangles or at least six fusees. The reference to three liquid-burning flares was removed by a final rule published on February 19, 2026 (91 FR 7867). Other warning devices may be used in addition to required devices, as long as they do not reduce the effectiveness of required devices.

### *Applicant's Request*

Aurora's application for exemption was described in detail in a **Federal Register** notice published on April 15, 2026 (91 FR 20252) and will not be repeated as the facts have not changed.

## IV. Public Comments

FMCSA received a total of 402 comments in response to Aurora's application. Commenters who support the exemption include the Montana Trucking Association; the Nevada Trucking Association; the Texas Trucking Association; the Autonomous Vehicle Industry Association (AVIA); the Association of Uncrewed Vehicle Systems International (AUVSI); the National Association of Manufacturers; the American Trucking Associations (ATA); the Intelligent Transportation Society of America (ITS America); Stack AV; Hirschbach Motor Lines LLC; Kodiak AI; International Motors and PlusAI; Gatik AI; Uber Technologies Inc.; Waymo LLC; Torc Robotics; Amazon; TechNet; Volvo Group North America (Volvo); the Consumer Technology Association (CTA); C.R. England Trucking; the Allegheny Conference on Community Development; the Bay Area Council; the Chamber of Progress; the Arizona Technology Council; Safety21, the U.S. Department of Transportation National University Transportation Center for Safety led by Carnegie Mellon University; DriveOhio; and the National Fraternal Order of Police.

Comments in support of the exemption cite the need for continued development of automated technologies and highlight the safety benefits of eliminating the requirement for a human to exit the vehicle to place warning devices under potentially hazardous roadway and traffic conditions. AUVSI supports granting the exemption to all Level 4 ADS-equipped CMV operators, conditioned on prior FMCSA notification, to allow the industry to innovate. AUVSI asserts that granting the exemption would acknowledge the reality that it is impossible for a driverless truck to place warning triangles on the roadway.

TECHNET states that ''the elevated and actively illuminated warning beacons enhance vehicle conspicuity, enabling earlier detection and safer responses from approaching motorists,'' as well as eliminate the need for a human to enter an active roadway. Commenters including TECHNET and CTA note that the current requirements for warning devices were developed decades ago. Several commenters, including AVIA and Volvo, not only support cab-mounted warning beacons for ADS-equipped CMVs, but also support warning beacons for traditional CMVs to eliminate the risk for drivers to exit the vehicle into potentially unsafe road conditions. Volvo highlights that ADS-equipped vehicles are designed with redundancies across critical systems, and cab-mounted beacons should have the same standards of reliability and automation as other critical systems.

Cassandra Burke Robertson, a professor from Case Western Reserve University School of Law, submitted comments in an individual capacity expressing support for the exemption. Professor Robertson notes in part that beacons are more reliable than warning triangles, which are vulnerable to displacement by wind, passing traffic, and terrain. Professor Robertson cites some concerns with longer vehicle combinations and suggests requiring supplementary rear-mounted beacons or reflectors on such vehicles. The ATA comments that FMCSA should grant the exemption based on the data from Aurora's operation under the waiver and the research studies submitted by Aurora. The ATA asks FMCSA to consider how data from multiple exemptions related to lighting solutions can be analyzed to improve conspicuity and safety for all CMVs.

Commenters who oppose the exemption include the Truck Safety Coalition (TSC), Citizens for Reliable and Safe Highways (CRASH), and Parents Against Tired Truckers (P.A.T.T.); the Federation of Professional Truckers (FOPT); the Small Business in Transportation Coalition (SBTC); AWM Associates; REAL Women in Trucking; Advocates for Highway and Auto Safety (Advocates); the Owner-Operator Independent Drivers Association (OOIDA); Mission Ready Transport; and DD–214 Transport LLC. Most commenters who oppose the exemption are individuals, including many truck drivers. Many individual commenters who oppose the exemption express concerns regarding blind corners blocking sight lines, the risk of single point electrical failures, the lack of performance standards for the proposed beacons, and the possible articulation of trailers blocking warning beacons.

OOIDA expresses concern that the two studies submitted with Aurora's application do not account for the varying weather, road, lighting, and traffic conditions that CMVs encounter. OOIDA also notes that Aurora did not provide specific information on the road conditions, time of day, and location where its cab-mounted beacons activated during the period in which Aurora operated under a waiver. OOIDA states that FMCSA should not grant any exemptions until it completes its ongoing research study on warning devices.[1] Several commenters, including OOIDA, Shon's Equipment, and an anonymous individual, commented that the existing regulations already require the use of flashing lights, and that the warning triangles provide an additional layer of safety not present with the warning beacons. REAL Women in Trucking also commented that warning triangles create a progressive warning zone to give motorists time to identify hazards. REAL Women in Trucking also cites concerns that the beacons could be obstructed by a trailer, roadway curvatures, hills, or other conditions.

Advocates commented that FMCSA denied Aurora's previous exemption request due to insufficient data and that the current application fails to address the previously identified deficiencies. Advocates believes that Aurora's use of the beacons for a total of ten hours during expected stops does not provide a sufficient basis to grant a five-year exemption and that testing the beacons during expected stops does not provide data on the performance of the beacons in an emergency. Advocates also states that the public should have the opportunity to review the waiver term reports that Aurora submitted to FMCSA. AWM Associates questions the effectiveness of the beacons in real-world scenarios where a truck breaks down at an angle, noting that an out-of-line trailer would physically block the cab-mounted lights. Further, AWM Associates suggests if the exemption were approved, it should be restricted to Aurora only for a one-year period. Joint comments submitted by TSC, CRASH, and P.A.T.T. note that cab-mounted beacons require the cab to be aligned with the trailer but in many emergencies a slight or severe jackknife may occur.

FOPT highlights the distance-spaced warning devices as necessary for blind curves, hills, entrance ramps, exit ramps, shoulders and low-visibility weather. SBTC asserts, among other things, that granting the exemption ''would open a can of worms'' in holding ADS-equipped CMVs to more lenient standards than CMVs driven by humans. Mission Ready Transport comments that the exemption would create a self-certification mechanism with no independent safety review of the equipment used by motor carriers operating under the exemption.

Jonathan Judge, an owner-operator, strongly opposes the exemption and states that the docket was flooded with comments that reflect a coordinated campaign to inflate Aurora's safety claims artificially. In addition, Mr. Judge observes that comments were submitted by individuals and organizations with undisclosed affiliations with Aurora. Mr. Judge further notes that a cab-mounted beacon does not provide depth perception. He explains that the National Transportation Safety Board has defined the concept of ''perceptual looming,'' which causes the driver to realize that an object is stationary and not moving. He states that the Manual on Uniform Traffic Control Devices and Traffic Incident Management protocols provide that first responders should establish an ''Advance Warning Area'' to initiate the perceptual looming response. He notes that law enforcement also deploys cone tapers and ''Lane + 1 blocking'' in recognition that emergency lights are insufficient.

Many individual commenters commented generally on their opposition to driverless CMVs. Those comments are out of scope because the exemption request relates specifically to Aurora's exemption request from the warning device placement requirements in 49 CFR 392.22(b), the steady-burning lamp requirement in 49 CFR 393.25(e), and the requirements for the types and number of warning devices is 49 CFR 393.95(f).

## V. FMCSA Decision

FMCSA has evaluated Aurora's exemption application, supporting materials, and the comments received. The Agency has determined that granting an exemption to allow Aurora to install cab-mounted warning beacons for Level 4 ADS-equipped CMVs, in lieu of placing warning triangles at specified locations in front of and behind the stopped CMVs, would likely achieve a level of safety equivalent to, or greater than, the level of safety that would be achieved without exemption. Other motor carriers operating Level 4 ADS-equipped CMVs may operate under the exemption only with prior notice to

[1] *See https://www.fmcsa.dot.gov/research-and-analysis/research/warning-devices-stopped-cmvs.*

FMCSA as described in the terms and conditions below.

As noted in Aurora's exemption application, Aurora initially applied for an exemption from the warning device placement requirements in 2023. FMCSA denied that exemption request, finding that the request to ''exempt a class of unspecified carriers using unspecified equipment on unspecified vehicles only further undermines the claimed likely equivalent level of safety'' (89 FR 105675, 105679, Dec. 27, 2024). The Agency subsequently granted a temporary, narrow waiver to Aurora, which Aurora attached to its present exemption application, and which is available in the docket. Aurora's present exemption application requests similar limitations to those included in the waiver. FMCSA finds that those limitations reasonably address the reasons for the 2024 denial and has incorporated those limitations into the terms and conditions of this exemption, providing the specificity and monitoring controls necessary to ensure highway safety. For example, the 2024 exemption request sought industry-wide regulatory relief whereby any motor carrier operating Level 4 ADS-equipped CMVs could operate under the exemption without any prior notice to FMCSA and made no mention of annual reports to the Agency, lacking monitoring controls. In contrast, this exemption requires any motor carrier, other than Aurora, to provide written notification to FMCSA prior to commencing operations covered by the exemption. Furthermore, to enable FMCSA's effective oversight, motor carriers must submit an annual report detailing any malfunctions, power issues, or other instances where the beacons did not operate in accordance with the exemption. In addition, the previous exemption request did not suggest prohibiting higher risk operations. This exemption prohibits operations that would otherwise require an ''H,'' ''X,'' ''P,'' or ''S'' commercial driver's license endorsement if a human driver were present, explicitly barring the transportation of passengers or of hazardous materials as defined in 49 CFR 383.5.

The 2024 denial also noted a lack of sufficient details about the proposed alternative devices. This exemption resolves that ambiguity by including technical specifications that mandate SAE J595 photometric performance standards, dictate specific mounting locations, and require a redundant source of power for the cab-mounted beacons to prevent single-point power failures of the beacons. Based on the above-mentioned limitations and terms and conditions, the Agency determined that the waiver would likely achieve a level of safety equivalent to, or greater than, the level of safety that would be achieved in the absence of the waiver. FMCSA has incorporated these precise waiver limitations into the terms and conditions of this exemption to distinguish it directly from the 2024 denial, providing the necessary specificity and monitoring controls.

Aurora states that it successfully used cab-mounted warning beacons under the waiver from October 10, 2025 through January 9, 2026 on 34 CMVs that traveled over 500,000 miles. This real-world mileage represents new performance data that was gathered after the December 2024 denial and, as such, was not contemplated by the Agency when it issued that prior decision. During that period, the beacons activated for a total duration of nearly 10 hours. Aurora reports that, to the company's knowledge, the beacons were reliable and operated as expected without any faults, malfunctions, or power issues. Aurora's CMVs that operated under the waiver were not involved in, nor contributed to, any roadway collisions while stopped on the roadway and using the beacons. Therefore, all data collected under the waiver indicated that Aurora's operations with the cab-mounted beacons did not degrade highway safety. Moreover, FMCSA did not receive any comments providing additional data or information, and is not aware of any additional data or information, indicating that the waiver negatively impacted safety. In response to Advocates' request to review the term reports that Aurora submitted to FMCSA under the waiver, FMCSA notes that Aurora submitted this information as confidential business information, per the terms of the waiver. Aurora's exemption application, however, summarizes the aggregate data reported during its operations under the waiver from October 10, 2025 through January 9, 2026 and is available in the docket.

In response to comments questioning the sufficiency of the studies submitted by Aurora, and the performance of the cab-mounted warning beacons in all roadway and weather conditions, FMCSA has reconsidered the two studies that Aurora submitted with its 2023 exemption application and again with its present application. The first is the ''Naturalistic Study of Warning Device Equivalency,'' prepared by Aurora in October 2022 (App. D to Aurora's application). The second is the ''Stopped Automated Commercial Motor Vehicle Warning Device Surrogates'' study, prepared by the Virginia Tech Transportation Institute (VTTI) for Waymo LLC on August 1, 2022 (App. E to Aurora's application). In the 2024 denial, FMCSA expressed concern that the Aurora naturalistic study showed a slightly lower percentage of drivers responding to beacons than warning triangles in five of eight scenarios. However, further analysis of the comprehensive data within these studies overcomes this concern and supports granting the exemption. Although the overall proportion of respondents may have been nominally lower in certain scenarios, the Aurora study revealed that the quality and timing of the responses were greater with the beacons. Specifically, in six of the eight tested scenarios, motorists initiated their first evasive response (such as a lane change or slowing down) further back from the trailer when exposed to the beacons compared to the triangles. Overall, the average Distance at Response (DAR) was 135.71 meters for the beacons versus 133.24 meters for the triangles, demonstrating that the beacons effectively gave drivers a greater distance to react. The study concluded that the beacons performed equivalently to the deployment of the triangles. The VTTI study corroborated these findings in a controlled environment, concluding that drivers demonstrated equivalent detection, recognition, and performance metrics across both daytime and nighttime conditions. Crucially, the VTTI study highlighted specific areas where beacons outperformed triangles, noting that nighttime beacon exposure elicited earlier braking and slower, safer passing speeds. VTTI researchers also observed that drivers exposed to the triangles were associated with an overcorrection of lateral distance during certain scenarios when compared to the beacons. The study also surveyed participants for their subjective opinions of the beacons compared to triangles. The results of the survey indicated 78.26 percent of daytime participants and 83.33 percent of nighttime participants reported that the beacons were more noticeable and easier to see than the traditional triangles. When considered together, these studies further support a determination that the beacons are likely to achieve a level of safety equivalent to, or greater than, the level of safety that would be achieved absent the exemption.

Although there may be some edge case circumstances in which a cab-mounted warning beacon may not perform as expected, ''such as a CMV on its side'' (89 FR at 105679), warning

triangles are also susceptible to being knocked over or not placed correctly or not placed at all due to human error or incapacitation following a crash. FMCSA has no data suggesting that the edge case circumstances where beacons fail to perform as expected occur more frequently than those where warning triangles are compromised. In addition, current regulations permit a 10-minute window before a driver is required to place warning triangles under 49 CFR 392.22(b). In the 2024 denial, FMCSA noted that while the applicants claimed their beacons would activate immediately, providing an advantage over the ''up to ten minutes'' allowed for triangles, they failed to demonstrate ''the timing with which they would do so, and how that timing compares to timing required under the FMCSR'' (89 FR at 105679). To cure this, FMCSA explicitly requires in the terms and conditions below that cab-mounted warning beacons must activate within five minutes, ensuring they activate much more quickly and minimize the hazardous period where a stopped vehicle sits without extended warning signals. By requiring a shortened five-minute activation window, this exemption enforces a clear, verifiable safety improvement over both the prior denied request and the existing regulatory allowance.

Although this exemption is limited in scope to CMVs equipped with a Level 4 ADS, cab-mounted warning beacons also present a practical safety benefit for traditional trucking operations. By eliminating the need for a driver to exit the cab physically, walk along an active highway or shoulder, and manually place warning devices, the beacons prevent drivers from being exposed to the risk of being struck by oncoming traffic. Given this likely benefit for human operators, FMCSA recognizes that updating the underlying warning device requirements for all CMVs, not just ADS-equipped CMVs, may be ripe for future regulatory action.

In response to Mr. Judge's comment about law enforcement procedures for traffic incident management, FMCSA does not have any data showing that warning triangle placement has the same effect on approaching motorists as lane +1 blocking or more extensive cone tapering methods used by law enforcement. In response to REAL Women in Trucking, FMCSA similarly lacks data showing that warning triangles significantly improve driver reaction time. As FMCSA observed in its letter granting the waiver (App. C to Aurora's application), there are historically unresolved questions of whether the use of such warning devices improves traffic safety and, if so, how and to what extent. Without information on the level of safety the current regulatory requirements provide, the two studies submitted in support of Aurora's application reasonably support a determination that motorists detect and respond to the beacons at a similar rate as existing warning devices under the terms and conditions imposed by this exemption.

FMCSA acknowledges Professor Robertson's concerns about the rear visibility of longer combination vehicles. The Agency is limiting the use of the exemption for longer combination vehicles to combinations using two, 28-foot trailers. As Aurora notes, a combination of two, 28-foot trailers adds approximately only 9.5 feet to a standard CMV's length. Although this configuration creates a minimally extended occlusion zone directly behind the trailer, the warning beacons' visibility is not materially impacted by this setup. The combination of the high mounting location on the cab, the brightness of the flashing amber beacons, the requirement for standard hazard warning signal flashers to activate, and the existing requirement for rear reflective markings in 49 CFR 393.11, ensures that approaching motorists will likely still observe the warning before nearing or entering this narrow area of occlusion. Furthermore, because motorists generally do not drive perfectly in line with the direct center of the rear of a trailer, and roadways are rarely perfectly straight, any potential occlusion of the cab-mounted beacons would likely be fleeting. Even during such brief moments, the vehicle's standard rear hazard warning signal flashers will remain activated per the terms of the exemption to provide continuous conspicuity to approaching traffic. FMCSA also allows use of the exemption for tankers. A tanker's cylindrical shape and lower overall profile is reasonably likely to provide greater awareness and visibility of the cab-mounted beacons compared to that of a traditional 53-foot box trailer. Transportation of passengers or hazardous materials that would otherwise require a commercial driver's license endorsement if a human driver were present are prohibited under the exemptions. FMCSA will monitor the use of the exemption as to LCVs and tankers through the annual reporting requirement in the terms and conditions in Section VI.C.7 of the exemption.

In response to comments expressing concern that the submitted studies and waiver operations do not account for every varying weather, road, lighting, and traffic condition encountered across the entire country, the terms of this exemption proactively address this limitation. Aurora's operations under the waiver were conducted primarily on the U.S. Interstate Highway System and under environmental conditions that were specific to its validated Operational Design Domain (ODD), and similarly, this exemption does not grant unrestricted nationwide deployment. Instead, the terms and conditions limit operations to roadways that are part of the validated ODD for the specific ADS-equipped CMV. Because a Level 4 ADS is constrained to operate only within its specific ODD, the vehicle—and its associated warning systems—will only be deployed in the specific geographic, roadway, and environmental conditions for which it has been engineered and validated to operate. By linking the use of the exemption directly to the vehicle's validated ODD, the Agency effectively bounds the operational risk and mitigates concerns associated with untested environments.

In conclusion, the totality of the evidence—comprising over 500,000 miles of real-world operation under the waiver without a negative safety impact, nearly 10 hours of successful beacon deployment, and empirical data from the VTTI and Aurora studies—demonstrates that cab-mounted beacons likely perform as effectively in alerting approaching motorists as triangles. By pairing this performance data with operational guardrails, including mandatory five-minute activation, redundant power requirements, ODD limitations, annual reporting requirements, and other specific terms similar to the waiver, FMCSA finds that this exemption cures the deficiencies identified in its prior denial (89 FR 105675). Therefore, the Agency determines that granting this exemption will likely achieve a level of safety equivalent to, or greater than, the level of safety that would be achieved absent such exemption.

## VI. Exemption

### *A. Grant of Exemption*

FMCSA grants an exemption from the warning device placement requirements in 49 CFR 392.22(b), the steady-burning lamp requirement in 49 CFR 393.25(e), and the requirements for the types and number of warning devices is 49 CFR 393.95(f). This exemption allows motor carriers operating under the exemption to use cab-mounted warning beacons, subject to the terms and conditions of the exemption, in lieu of the warning devices specified in 49 CFR 393.95(f).

*B. Applicability of Exemption*

This exemption applies to Aurora for its operation of commercial motor vehicles (CMVs), as defined in 49 CFR 390.5T, equipped with a Level 4 ADS, as defined by SAE International in Table 1 of SAE J3016 (Apr. 2021). This exemption also applies to any other motor carrier operating CMVs equipped with a Level 4 ADS, provided such motor carrier provides written notification to FMCSA that includes the notification specified in Section VI.C. During the exemption period, motor carriers operating Level 4 ADS-equipped CMVs may install and use cab-mounted warning beacons at locations specified in VI.C.

*C. Terms and Conditions*

1. *Notification.* Any motor carrier, other than Aurora, that intends to operate CMVs under this exemption must notify FMCSA in writing prior to commencing operations covered by this exemption. The notification must be sent to FMCSA via email to *MCPSV@dot.gov* with the following information:

a. The motor carrier's legal name, USDOT number, and principal place of business, and point of contact of the motor carrier.

b. A statement that adequately demonstrates the motor carrier currently has cab-mounted warning beacons and the ability to comply with all terms and conditions of this exemption.

c. A statement affirming the motor carrier will comply with all terms and conditions of this exemption.

d. In accordance with 28 U.S.C. 1746, the notification must include the following language: ''I, [Name], certify under penalty of perjury that the foregoing is true and correct. Executed on [Date], [Signature].''

2. *Operations.*

a. Operations under this exemption shall occur only on roadways that are part of the validated Operational Design Domain for the specific ADS-equipped CMV.

b. Operations under this exemption are prohibited if operations would otherwise require an ''H,'' ''X,'' ''P,'' or ''S'' endorsement under 49 CFR 383.93—if a human driver were present.

c. Operations under this exemption of longer combination vehicles (LCV), as defined in 49 CFR 380.105, are limited to LCV doubles with two, 28-foot trailers. This exemption must not be used for operations with LCV triples.

d. Each motor carrier operating under this exemption is prohibited from operating as a for-hire passenger carrier or private passenger carrier, or transporting hazardous materials as defined in 49 CFR 383.5, while using this exemption.

3. *Cab-Mounted Warning Beacon Specifications.* The cab-mounted warning beacons, a safety device, used under this exemption must consist of forward- and rearward-facing flashing lights.

a. *Mounting.* At least one rearward-facing light must be mounted on each side of the cab, and at least one forward-facing light mounted on the front of the cab. The mountings must provide stable support for the beacons. The total width of the vehicle, inclusive of mountings and lights, may not exceed 122 inches.

b. *Location.* All lights must be mounted at least 100 inches from the ground and located at or above the upper edge of the sideview mirrors but below the top edge of the cab.

c. *Performance.* The cab-mounted warning beacons must be amber in color and meet the Class 1 photometric performance requirements of SAE J595.

d. *Flash Pattern.* The activation of the warning system must cause the beacons to flash at a rate different from the vehicle's standard hazard warning signal flashers required under 49 CFR 392.22(a).

e. *Power.* The beacons must be designed and installed with redundant power sources to prevent failure due to a single-point power failure.

4. *Activation and Operation:*

a. The beacons must activate as soon as possible, but in any event within five minutes, whenever the CMV is stopped on the traveled portion or the shoulder of a highway for any cause other than necessary traffic stops (*i.e.,* whenever 49 CFR 392.22(b) would otherwise apply).

b. The beacons must remain flashing for the entire duration of the stop, from the initial stop until the vehicle reinitiates movement or the vehicle is recovered.

c. Standard hazard warning signal flashers must also activate as required by 49 CFR 392.22(a) and must continue flashing for the entire duration of the stop.

5. *Other.*

a. Each motor carrier operating under this exemption must comply with all other applicable Federal Motor Carrier Safety Regulations (49 CFR parts 350–399).

b. Each motor carrier operating under this exemption shall, at FMCSA's request, meet with FMCSA to answer questions regarding data and information required to be provided under this exemption.

6. *Crash Reporting.* Each motor carrier operating under this exemption must notify FMCSA via email to *MCPSV@dot.gov* not later than five calendar days of any crash involving a CMV while the cab-mounted warning beacons are activated or should have been activated per the conditions of this exemption. For the purposes of this exemption, the term ''crash'' shall have the same meaning as defined in the National Highway Traffic Safety Administration's (NHTSA) Third Amended Standing General Order (SGO) 2021–01.[2] Notification must include all available information regarding the circumstances of the crash, including the following information:

1. Identifier of the Exemption (''Exemption of Warning Device Requirements'').

2. Date and time of the crash.

3. City or town, and State, in which the crash occurred, or closest to the crash scene, and geolocation information.

4. Vehicle Identification Number (VIN).

5. Description of any property damage.

6. Number of individuals suffering physical injury.

7. Number of fatalities.

8. The police-reported narrative of the crash (if available at the time of the report or provided upon its completion).

7. *Annual Report*

Each motor carrier operating under this exemption, must submit a report to FMCSA via email to *MCPSV@dot.gov* upon request, and annually by November 1 each year the motor carrier operates under the exemption (or not later than 30 calendar days of ceasing operations under this exemption). This report must include the following information covering the entire period of operation under this exemption:

a. Total number of its CMVs that operated under the exemption.

b. Total vehicle miles traveled by its CMVs under the exemption.

c. Data on the frequency, duration, date, location (including road type: interstate, State highway, local road, etc.), vehicle configuration (including tanker, double trailer, single trailer, straight truck), and reason for each malfunction, power issue, or other instance where the beacons did not

[2] Under NHTSA's Third Amended SGO 2021–01, '''Crash' means any physical impact between a vehicle and another road user (vehicle, pedestrian, cyclist, etc.) or property that results or allegedly results in any property damage, injury, or fatality. A subject vehicle is involved in a crash if it physically impacts another road user or if it contributes or is alleged to contribute (by steering, braking, acceleration, or other operational performance) to another vehicle's physical impact with another road user or property involved in that crash.'' The SGO is available at: *https://www.nhtsa.gov/sites/nhtsa.gov/files/2025-04/third-amended-SGO-2021-01_2025.pdf.*

operate in accordance with the terms of the exemption.

d. The specific mounting locations of all cab-mounted warning beacons used on its CMVs.

e. Whether any variations in cab-mounted warning beacon types, mounting, or flash patterns were used across its fleet when operating under the exemption. If variations were used, any performance differences among the beacons.

8. *Request To Treat Information as Confidential Business Information (CBI).* Nonpublic information submitted by a motor carrier under Section VI.C.6 or 7 above will be treated as CBI, which is defined as commercial or financial information that is both customarily and actually treated as private by its owner,[3] if designated as such by the submitting motor carrier. FMCSA will withhold CBI from public disclosure to the greatest extent possible consistent with the Freedom of Information Act (5 U.S.C. 552), and DOT's implementing regulations at 49 CFR part 7.

9. *Safety Notification.* Each motor carrier operating under this exemption, must notify FMCSA via email to *MCPSV@dot.gov* not later than five calendar days after it becomes aware, or otherwise determines, that the continued use of cab-mounted beacons covered by this exemption is no longer likely to maintain a level of safety that is at least equivalent to the level that would be achieved absent this exemption.

*D. Preemption*

In accordance with 49 U.S.C. 31315(d), as implemented by 49 CFR 381.600, during the period this exemption is in effect, no State shall enforce any law or regulation applicable to interstate commerce that conflicts with or is inconsistent with this exemption with respect to a firm or person operating under the exemption. States may, but are not required to, adopt the same exemption with respect to operations in intrastate commerce.

**VII. Termination**

FMCSA does not expect the motor carriers covered by this exemption will experience any deterioration of their safety record. However, the exemption will be revoked as to all motor carriers or an individual motor carrier if: (1) the motor carrier or motor carriers operating under the exemption fail to comply with the terms and conditions of the exemption; (2) the exemption results in a lower level of safety than was maintained before it was granted; or (3) continuation of the exemption would not be consistent with the goals and objectives of Title 49, chapter 313 or section 31136.

**Derek D. Barrs,**
*Administrator.*

[FR Doc. 2026–20734 Filed 10–8–26; 8:45 am]

BILLING CODE P

[3] *Food Mktg. Inst.* v. *Argus Leader Media,* 588 U.S. 427, 440 (2019).

---

## DEPARTMENT OF TRANSPORTATION

### Maritime Administration

**[Docket No. MARAD–2026–1684]**

### Request for Comments on the Renewal of a Previously Approved Information Collection: Application and Reporting Elements for Participation in the Tanker Security Program

**AGENCY:** Maritime Administration (MARAD), U.S. Department of Transportation (DOT).

**ACTION:** Notice.

**SUMMARY:** MARAD invites public comments on its intention to request Office of Management and Budget (OMB) approval to renew an information collection in accordance with the Paperwork Reduction Act of 1995. The proposed collection OMB 2133–0554 (Application and Reporting Elements for Participation in the Tanker Security Program) is used to evaluate the eligibility of applicants for participation in the Tanker Security Program (TSP). Since the last renewal, the application form for this collection is being updated to include minor clerical amendments regarding the authorizing statute and procedures for electronic submission. MARAD is required to publish this notice in the **Federal Register** to obtain comments from the public and affected agencies.

**ADDRESSES:** Written comments and recommendations for the proposed information collections should be sent within 30 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Richard Wanerman, 202–366–2306, Office of Sealift Support, Maritime Administration, 1200 New Jersey Avenue SE, Room W23–103, Mail Stop 2, Washington, DC 20590, *Richard.Wanerman@dot.gov.*

**SUPPLEMENTARY INFORMATION:**

*Title:* Application and Reporting Elements for Participation in the Tanker Security Program.

*OMB Control Number:* 2133–0554.

*Type of Request:* Extension with change of a currently approved collection.

*Abstract:* 46 U.S.C. chapter 534 established the Tanker Security Program (TSP) as a fleet of active, commercially viable, militarily useful, privately owned product tank vessels to meet national defense and other security requirements and maintain a United States presence in international commercial shipping. TSP provides for enrollment of eligible tank vessels in the program for FY 2022 through FY 2040. Applications and amendments will be used to select vessels for the fleet. Periodic reporting will be used to monitor adherence of participants to program parameters.

*Respondents:* Operators of United States-registered product tank vessels.

*Affected Public:* Business or other for profit.

*Estimated Number of Respondents:* 10.

*Estimated Number of Responses:* 160.

*Estimated Hours per Response:* 1–6.

*Annual Estimated Total Annual Burden Hours:* 280.

*Frequency of Response:* Monthly/Annually.

A 60-day **Federal Register** Notice soliciting comments on this information collection was published on July 30, 2026 (FR 48216, Vol.91, No. 145). No comments were received.

(Authority: The Paperwork Reduction Act of 1995; 44 U.S.C. Chapter 35, as amended; and 49 CFR 1.49.)

By Order of the Maritime Administrator.

**T. Mitchell Hudson, Jr.**
*Secretary, Maritime Administration.*

[FR Doc. 2026–20760 Filed 10–8–26; 8:45 am]

BILLING CODE 4910–81–P

---

## DEPARTMENT OF TRANSPORTATION

### Maritime Administration

**[Docket No. MARAD–2026–1685]**

### Request for Comments on the Renewal of a Previously Approved Information Collection: War Risk Insurance, Applications, and Related Information

**AGENCY:** Maritime Administration (MARAD), U.S. Department of Transportation (DOT).

**ACTION:** Notice.

**SUMMARY:** MARAD invites public comments on its intention to request Office of Management and Budget